UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE SHYFT GROUP USA, INC., F/K/A
SPARTAN MOTORS USA, INC.,

    Plaintiff,

v.

API HEAT TRANSFER THERMASYS
CORPORATION,

    Defendant.
_____/

Case No. 1:18-cv-797

Honorable Hala Y. Jarbou

## OPINION

Plaintiff Shyft Group USA, Inc.[1] is suing Defendant API Heat Transfer Thermasys Corporation for damages "incurred as a result of defective cooling systems that Defendant supplied to [Shyft] for use in the chassis it manufactures for luxury motor homes." (Compl., ECF No. 1, PageID.1.) According to Shyft, some large percentage of the cooling packages manufactured by API leaked after normal use by customers driving RVs. Shyft asserts three causes of action: breach of contract (Count I), breach of express warranty of fitness for a particular purpose (Count II), and breach of implied warranty of fitness for a particular purpose (Count III). Before the Court are the parties' cross-motions for summary judgment. Shyft moves for summary judgment on Counts I and II (ECF No. 56), while API seeks judgment on all Counts (ECF No. 59). Both motions will be denied.

---

[1] Plaintiff went by a different name – Spartan Motors USA, Inc. – when this action commenced in 2018. In April 2020, Plaintiff amended its Articles of Incorporation to change its name to the Shyft Group, USA Inc. (ECF No. 57-2.) All relevant documents in the record that use the name Spartan will be treated as referring to Shyft.

## I. Jurisdiction

Shyft's complaint brings three causes of action, all rooted in state law. Federal courts may exercise diversity jurisdiction over state law claims if the amount in controversy exceeds $75,000 and no plaintiff is a citizen of the same state as any defendant. 28 U.S.C. § 1332. Shyft alleges damages exceeding $2.8 million. (Compl., PageID.2.) Shyft is a South Dakota Corporation with its principal place of business in Michigan. (*Id.*) API is a Delaware corporation with its principal place of business in New York. (*Id.*) The Court has jurisdiction because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

## II. Background

### A. Parties

Shyft assembles chassis and complete vehicles of motor homes, fleet vehicles, and other specialty vehicles. (Chestnut Dep., ECF No. 57-3, PageID.447-48.) It contracts with numerous suppliers to design and manufacture components to be incorporated into its chassis and vehicles. (Hundt Dep. 40, ECF No. 57-4.) API is a designer and manufacturer of cooling packages in the automotive industry. (Rzeznik Aff. ¶¶ 4-5, ECF No. 59-14.)

### B. Facts

Sometime in 2009, Shyft engaged API to manufacture cooling packages for certain luxury mobile home chassis. (*See id.*) The exact nature of the relationship is hotly contested. Shyft asserts that it hired API to design, develop, test, and manufacture a cooling package that would meet its needs. (*See* Eloff Decl. ¶¶ 6-9, ECF No. 68-1.) API claims that it was simply asked to manufacture a prototype cooling package that had already been designed by Shyft. (*See* Rzeznik Aff. ¶ 33.) Consequently, the parties dispute authorship of the relevant blueprints and specifications for the cooling package at issue.

During development and at Shyft's direction, API conducted vibration testing, designed to simulate a driving vehicle, to ensure that the cooling packages would work. (*Id.* ¶¶ 30.) API requested Shyft to provide a "full mounting system assembly along with a fixture" to properly replicate the environment in which the cooling packages would operate. (*Id.* ¶¶ 22-24.) Shyft did not tender a complete mock-up of the system requested by API, instead only providing a portion of the mounting system. (*Id.* ¶¶ 25, 29.) API advised Shyft that testing would be unreliable without a complete mock-up. (*Id.* ¶ 27.) Nevertheless, API performed vibration tests with an incomplete system mock-up in September and October 2009 (*Id.* ¶ 30), and again in September 2010 (09/28/2010 Test Report, ECF No. 57-11). "During vibration testing, the components provided by [Shyft] failed," but the "API cooling packages completed [the testing] without any leaks." (Rzeznik Aff. ¶¶ 31-32; *see also id.*)

The timeline is not perfectly clear. In December 2009, after some testing had been performed but before the September 2010 tests, Shyft and API signed a contract through which API was to manufacture the cooling packages for Shyft. (Supplier Warranty Agreement, ECF No. 1-1.) The contract, though called a Supplier Warranty Agreement ("SWA"), included both contractual promises and express warranties by API. API began producing the cooling packages and Shyft installed those cooling packages into the intended motor home chassis.

Problems arose. Beginning in 2012, according to Shyft, "when end users drove the luxury motor homes equipped with API's radiator cooling system as intended, hundreds of the cooling systems cracked, leaked, and catastrophically failed." (Pl.'s Br. in Supp. of Mot. for Summ. J., ECF No. 57, PageID.415.) Shyft claims that over 60% of the cooling packages failed (Chestnut Dep., PageID.538), though API objects that Shyft does not specify exactly how many failures

occurred (Def.'s Resp. in Opp'n to Pl.'s Mot. for Summ. J., ECF No. 69, PageID.1287).[2] Either way, when a cooling package failed, Shyft would provide a replacement at its own expense and ship the failed package to API with a request for reimbursement through a warranty provision in the SWA. (Eloff Dep. 72-73, ECF No. 57-5.) API concluded that the packages were failing due to deficiencies in Shyft's mounting system. (*See* Roensch Report 11, ECF No. 69-24.) According to API, the mounting system was Shyft's responsibility and thus not covered by the SWA's warranty. It refused to reimburse Shyft for any of the broken cooling packages. (Pl.'s Br. in Supp. of Mot. for Summ. J., PageID.420.) This litigation ensued.

### III. Standard

**A. Summary Judgment**

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine whether there is a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P 56(c)) (internal quotations omitted). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank. of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party [by a preponderance of the evidence], there is no 'genuine issue for

---

[2] In its brief, Shyft claims it "processed 487 warranty claims for vehicles that experienced radiator cooling system failures" in the three years leading up to the present lawsuit. (Pl.'s Br. in Supp. of Mot. for Summ. J., PageID.420 (citing Sheets Expert Report ¶ 69, ECF No. 57-14.)

4

trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *City Serv.*, 391 U.S. at 289). In considering the facts, the Court must draw all inferences in the light most favorable to the nonmoving party. *Id.* Summary judgment is not an opportunity for the Court to resolve factual disputes. *Anderson*, 477 U.S. at 249.

### IV. Analysis

Much of this controversy centers on the obligations arising from the SWA. The SWA included both contractual promises and express warranties by API. As is relevant here, API promised to: (1) "provide documented application approval for the components sold to [Shyft]," i.e. "put in writing the fact that it approves of the specific application for which [Shyft] is using the components [that API] sells to [Shyft]"; (2) notify Shyft if its opinion regarding the prior approval ever changed; (3) "provide, in writing, [API's] approval as to the way [Shyft] installs" the cooling packages; and (4) document, in writing, any concerns API had relative to the "installation process." (SWA, PageID.9.)

The SWA also included a powerful warranty section. API expressly warranted that the cooling packages would be "fit for the purposes for which [Shyft] intends them and free from faults and defects." (*Id.*, PageID.10.) This warranty of fitness for purpose would apply regardless of Shyft's "approval of a sample, drawing, specification or standard." (*Id.*) Moreover, the warranty would "extend to future performance of the components and survive inspection, tests, acceptance and payment and shall be considered to have been given not only to [Shyft] but also to [Shyft's] customers and to end-users." (*Id.*) The warranty would last "from the registration date of the chassis to the end user plus 3 years, or 50,000 miles, (whichever occurs first)." (*Id.*) The warranty term was subject to an additional constraint: warranty claims that arose within 3 years/50,000 miles would be reviewed on a "case-by-case" basis if the cooling packages were manufactured more than 42 months prior to their respective warranty claims. (*Id.*)

Two other critical issues bear on this case: the cause of the cooling packages' failure and which party conceived/designed the cooling package. If a superseding cause is responsible for the failures, then neither API's express nor implied warranty of fitness for a particular purpose would trigger liability. And if Shyft itself designed or was substantially involved in the design and development of the cooling package at issue, then as a matter of law API made no implied warranty of fitness for a particular purpose.

As will be explained below on a claim-by-claim basis, there are genuine disputes of material fact that prevent the Court from granting summary judgment to either party on any Count.

### A. Count I – Breach of Contract

Shyft offers two theories of liability for its breach of contract claim: (1) API failed to perform certain contractual obligations imposed on it by the SWA; and (2) breach of the express warranty in the SWA is itself a breach of contract. Unlike breach of implied warranty, "express-warranty claims are contract-based" and therefore a breach of an express warranty is also a breach of contract. *Parrott v. Family Dollar, Inc.*, No. 17-C-222, 2020 WL 1888927, at *1 (N.D. Ill. Apr. 16, 2020). Each theory of liability will be discussed in turn.

#### 1. Breach of contractual obligations

Shyft argues it is entitled to summary judgment on its first claim because: (1) in light of the subsequent failures, API should not have approved the cooling packages' "specific application"; and (2) API later failed to revoke or revise its approval once the packages began to fail at tremendous rates. (Pl.'s Br. in Supp. of Mot. for Summ. J., PageID.415, 420.) Shyft's argument rests on the premise that the phrase "specific application" encompasses failures resulting from deficiencies in the cooling package mounting system, which API asserts was the root cause of the problem and not within the meaning of "specific application." However, the Court need not reach that issue. Shyft has put forward no evidence – not even an allegation in the complaint –

6

that API ever gave written approval of the cooling packages' specific application or later failed to revoke its approval.[3]  In fact, Shyft never cites to the record when it asserts that API approved or later failed to revoke approval of the cooling packages' application.  Shyft has not produced any evidence speaking to the element of breach in its breach of contract claim.  Therefore, it is not entitled to summary judgment.

API's motion for summary judgment on this claim fails for the same reason: it points to no evidence in the record establishing that it satisfied its contractual obligations under the SWA.  API was required to provide written approval of the cooling packages' "specific application" as well as the way Shyft would install those packages.  (SWA, PageID.9.)  Nothing in the record demonstrates that it did so.  Of course, Shyft bears the burden of proving its own claims, and therefore API would not be required to prove that it complied with the SWA where it is entitled to summary judgment for Shyft's failure to produce any evidence speaking to an element of the breach of contract claim.  *See Celotex*, 477 U.S. at 323 (moving party entitled to summary judgment where non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof").  But API does not argue for summary judgment on the grounds that Shyft failed to prove that a breach of contract occurred.  Instead, API seeks summary judgment because it claims that it satisfied its obligations under the SWA.  The Court will not give API something it did not ask for. Its motion for summary judgment on Count I will be denied.

---

[3] Of course, proving that something *did not* happen can be a vexing challenge.  But even a simple affidavit from a corporate officer would have put evidence in the record that API never revised or revoked their apparent approval of the cooling packages' application.

7

### 2. Breach of express warranty

Though Shyft can also assert breach of contract by virtue of breach of express warranty, such a claim only succeeds to the extent that API breached the express warranty in the SWA. As will be discussed below in Section IV.B, neither party is entitled to summary judgment on Shyft's claim for breach of express warranty. Therefore, summary judgment cannot be granted on the grounds that API breached (or did not breach) its express warranty.

### B. Count II – Breach of Express Warranty of Fitness for a Particular Purpose

#### 1. Shyft's motion for summary judgment

Shyft argues that it deserves summary judgment on Count II for a simple reason: API expressly warranted that the cooling packages were fit for the purpose for which Shyft intended them, and the high rate of failure for the packages demonstrate that they were not fit for Shyft's intended purpose. API makes three counterarguments in its opposition brief: (1) that it is not liable for breach of warranty of fitness for a particular purpose because Shyft designed the cooling packages in question; (2) that the mounting system caused the failures, which was Shyft's responsibility, not API's, and the warranty therefore did not apply; and (3) that Shyft cannot prove that each cooling package in question failed within the warranty term.

##### a. Design

The parties dispute who designed the cooling packages in question. API points out that the blueprints and specifications for the cooling package appear on Shyft documents bearing Shyft's letterhead, indicating the cooling package was designed by Shyft, not API. (Cooling Package 0156-ZZ4 Specifications, ECF No. 59-4.) API also provides an email in which an API employee, referring to the cooling package specifications, asked a Shyft employee to "please provide the following that [are] listed on *your* drawings." (11/20/2009 Email, ECF No. 59-11 (emphasis added).) Shyft cites a magazine article in which API touts that it designed the cooling package for

8

Shyft (ECF No. 57-7) and an email between Shyft and API (ECF No. 57-8) as evidence that API designed the cooling package. API contends that the magazine article is inadmissible hearsay, and thus cannot be considered by the Court, but makes no argument regarding the admissibility of the email. The email is sufficient to create a genuine dispute; therefore, the Court need not determine whether the magazine article is admissible at this point in time. In the email, a Shyft employee asks whether the cooling package design "is being used on applications other than [Shyft's]," to which an API employee replied that "[n]one of [the cooling packages] are used in any other applications." (06/04/2015 Email, PageID.780, 779.) If Shyft designed the cooling package in question, it would be bizarre for it to ask API whether its own design was being used in any non-Shyft applications, and stranger still for API to answer the substance of the question without mentioning that Shyft provided the design at issue. On the other hand, the design specifications presented to the Court bear Shyft's letterhead, and API provides its own email evidence suggesting that Shyft designed the package. There is a genuine dispute as to which party designed the cooling package.

It is not entirely clear that this genuine dispute speaks to a material fact, i.e., the Court is unsure whether design authorship is a material issue when dealing with express warranties of fitness for a particular purpose. A plaintiff cannot sue for breach of an *implied* warranty of fitness for a particular purpose where the plaintiff itself furnished such extensive demands, designs, and specifications that the defendant's task was reduced to simply building something "in accord with the designs and specifications furnished by" the plaintiff. *Beaman v. Testori*, 35 N.W.2d 155, 157 (Mich. 1948). Warranties of fitness will not be implied in such situations because it is presumed that the plaintiff was not relying on the expertise or judgment of the defendant. *Id.*

API argues that this logic extends to express warranties of fitness but fails to cite a single case holding such. Shyft notes that API exclusively cites to cases applying this principle to implied warranty cases, but likewise fails to cite any authority indicating that the rule is inapplicable to express warranties of fitness for a particular purpose. Forced to do the parties' research itself, the Court found a single case which suggests that design authorship is a relevant question when dealing with express warranties of fitness. *Keiper LLC v. Intier Auto. Inc.*, No. 08-12096, 2010 WL 1063746, at *12 (E.D. Mich. Mar. 22, 2010) (*Keiper I*), *rev'd on other grounds* 467 F. App'x 452 (6th Cir. 2012). In deciding whether a breach of express warranty of fitness for a particular purpose occurred, the *Keiper I* court held that the "design responsible" party "is the party that is to be held responsible for the integrity of that design." *Id.* This suggests that design authorship matters. Hence, if Shyft was the "design responsible party," then it may not be permitted to sue for breach of express warranty. If design authorship is relevant here, there is a genuine dispute of material fact and Shyft is not entitled to summary judgment on Count II. The Court is reluctant to wade into seemingly undecided issues in Michigan law. Because summary judgment is foreclosed on other grounds, the Court will not decide whether design authorship precludes a plaintiff from recovering on a claim for breach of express warranty of fitness for a particular purpose.

### b. Mounting system

Summary judgment is also inappropriate because there is a genuine dispute as to whether the mounting system for the cooling packages caused the failures. Express warranties of fitness for a particular purpose do not extend to superseding causes for failure. *See Keiper, LLC v. Intier Auto. Inc.*, 476 F. App'x 452, 461 (6th Cir 2012) (*Keiper II*) (component may have failed for unanticipated actions by other parties and thus for reasons unrelated to any deficiencies in design or manufacturing of component). Shyft is therefore incorrect in its argument that the root cause of the packages' failures is irrelevant to the breach of express warranty claim. Thus, there are two

relevant questions here: (1) why did the packages fail; and (2) was the reason for failure a superseding cause?

API claims that the cooling packages failed because the mounting system used to install the packages in chassis was defective. (Roensch Report 2.) Shyft counters that the root cause of the packages' failure was never definitively established, and that reports from API suggested the problem could have been in the "brazing process" for manufacturing the packages and thus unrelated to the mounting system. (*See, e.g.*, Chestnut Dep. 94.) This is a genuine dispute and the *reason* the packages failed is material. An express warranty of fitness for a particular purpose does not cover superseding causes of failure. Where, as here, there are genuine disputes relating to the cause of failure, summary judgment will not be granted.

And a defective mounting system could be a superseding cause of failure. Shyft argues that API would still be liable if the mounting system was defective because the SWA required API to approve "the way [Shyft] installs [the cooling packages]" and to document "any concerns relative to the installation process." (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., ECF No. 71, PageID.1639 (citing SWA, PageID.9).) Its contention appears to be that API's contractual obligation to approve of the way the cooling packages were installed in chassis means that the method of installation is incorporated into API's warranty of fitness for a particular purpose. However, Shyft only makes this argument *in response* to API's motion for summary judgment; it does not mention this argument in its own motion for summary judgment. Moreover, as discussed previously, Shyft points to nothing in the record demonstrating that API ever approved or failed to approve anything. The Court will not entertain arguments that the parties fail to make. The defective mounting system could be a superseding cause of the cooling packages' failure and Shyft will not be granted summary judgment.

11

### c. Warranty term

Having already determined that Shyft is not entitled to summary judgment on Count II, the Court will not analyze the warranty term argument raised by API in its opposition to Shyft's motion. Issues relating to the warranty term will be addressed when the Court considers API's own motion for summary judgment.

### 2. API's motion for summary judgment

API makes the same arguments for its summary judgment motion as it raised in its opposition to Shyft's motion: (1) that it is not liable for breach of warranty of fitness for a particular purpose because Shyft designed the cooling packages in question; (2) that the mounting system caused the failures, which was Shyft's responsibility, not API's, and the warranty therefore did not apply; and (3) that Shyft cannot prove that each cooling package in question failed within the warranty term. Summary judgment will not be granted with respect to the first two arguments for the same reasons set forth in Section IV.B.1. Now the Court must consider whether API is entitled to summary judgment on grounds that Shyft has failed to produce evidence indicating each relevant cooling package failed during the warranty term.

API argues that Shyft has not produced evidence showing that *each* cooling package subject to a warranty claim actually failed during the warranty term. However, this conflates breach with damages. To succeed on its breach of express warranty claim (as well as its breach of contract claim), Shyft is only required to show that a breach occurred and that it suffered some loss – that is, it must show that at least one cooling package that failed is covered by the express warranty. *See Gorman v. Am. Honda Motor Co.*, 839 N.W.2d 223, 233 (Mich. Ct. App. 2013) (no recovery where plaintiff proved breach of warranty but failed to prove she had suffered *any* damages as a result of the breach). Anything beyond that is a question of damages, which is a separate issue and not presently before the Court. Nowhere does API assert that Shyft has failed

12

to show that *none* of the cooling packages broke during the warranty term. API's argument misconstrues the law and therefore it will not be granted summary judgment.

### C. Count III – Breach of Implied Warranty of Fitness for a Particular Purpose

Only API seeks summary judgment on Count III. It argues that it cannot be liable for breach of implied warranty of fitness because: (1) Shyft designed the cooling packages, or at least collaborated in its design; and (2) the cooling packages failed because of the defective mounting system, which was Shyft's responsibility. The latter argument does not merit summary judgment for the same reasons discussed in Section II.B.1.b. However, there are potential legal differences between the applicability of express and implied warranties of fitness where the plaintiff designed the product in question. *See supra* Section IV.B.1.a (discussing design authorship in the context of express warranties of fitness). Therefore, the Court will analyze whether Shyft's alleged involvement in the design of the cooling package entitles API to summary judgment on Count III.

Unlike questions relating to breach of express warranty, Michigan law is entirely clear here: no warranty of fitness for a particular purpose is implied where the plaintiff provides designs and specifications for the thing it wants manufactured to such an extent that the plaintiff is not relying on defendant's expertise and defendant's sole task is to manufacture the product in conformance with the furnished specifications. *Beaman*, 35 N.W.2d at 157; *see also* 17A C.J.S. Contracts § 473 (2001). "If a known, described and defined article is agreed upon and that known, described or defined article is furnished, there is no implied warranty of fitness, even though the seller is the manufacturer, and the buyer disclosed to him the purpose for which the article was purchased." *Id.* (internal quotations omitted). As discussed earlier, there is a genuine dispute as to which party – Shyft or API – designed the cooling package in question. This forecloses the possibility of summary judgment in favor of API on the grounds that Shyft designed the cooling package in question and simply told API what to build.

13

But API argues that no warranty of fitness is implied where the plaintiff even *collaborates* in the design of the product at issue. (Def.'s Br. in Supp. of Mot. for Summ. J., PageID.1017.) API cites to *Price Bros. Co. v. Phila. Gear Corp.*, 649 F.2d 416 (6th Cir. 1981), to support its proposition. The court in *Price Bros.* refused to imply a warranty of fitness even though the plaintiff had not, strictly speaking, designed the product that was the subject of the lawsuit. *Id.* at 423. Rather, the plaintiff and defendant had essentially designed the product together. The court held that a warranty of fitness could not be implied because "the degree of specificity of [the plaintiff's] purchase order and [the plaintiff's] own *undisputed high degree of knowledge* regarding the mechanical requirements of its own pipe wrapping machine [made] any finding that [the plaintiff] relied on [the defendant's expertise] clearly erroneous." *Id.* (emphasis added).

As Shyft points out, *Price Bros.* was interpreting Ohio law and thus does not govern here. However, the underlying rationale of *Price Bros.* is both instructive and persuasive, and demonstrates that API is not entitled to summary judgment. *Price Bros.* makes clear that the warranty of fitness is implied when, among other things, the purchaser is relying on the knowledge, judgment, or expertise of the seller that the purchaser lacks itself. Hence, there is not some bright-line inquiry regarding design authorship. What matters is whether the plaintiff relied on the defendant's expertise in the design process. Shyft points to multiple depositions in the record showing that it is a "generalist" firm that typically relies on the expertise of others when designing particular components, as it did with the cooling package. (*See, e.g.*, Eloff Dep. 52, ECF No. 57-5.) The degree of Shyft's reliance on API is a genuinely disputed material fact. It is not enough to show that Shyft merely participated in the design of the cooling package on some level. API must demonstrate that Shyft was involved to such an extent that it was not truly relying on API's

14

expertise in the design and development of the cooling package. Consequently, API is not entitled to summary judgment on Count III.

## V. Conclusion

For the foregoing reasons, both Shyft's (ECF No. 56) and API's (ECF No. 59) motions for summary judgment will be denied. An order will enter consistent with this opinion.

Dated:  January 26, 2021                                  /s/ Hala Y. Jarbou
                                                          HALA Y. JARBOU
                                                          UNITED STATES DISTRICT JUDGE